COURT OF APPEALS
DECISION
DATED AND FILED

December 17, 2024

Samuel A. Christensen
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     2023AP67

Cir. Ct. No.  2019CV58

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

FREY CONSTRUCTION & HOME IMPROVEMENT, LLC,

   PLAINTIFF-RESPONDENT,

V.

HASHEIDER ROOFING & SIDING, LTD.,

   DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Sauk County: WENDY J.N. KLICKO, Judge. *Reversed and cause remanded with directions.*

Before Stark P.J., Hruz and Gill, JJ.

¶1     GILL, J.  Frey Construction & Home Improvement, LLC, filed the present lawsuit against Hasheider Roofing & Siding, Ltd., alleging tortious interference with a contract.  The allegations stem from Hasheider's hiring one of Frey's former employees, Anthony Bauernhuber, resulting in Frey's claim that

Hasheider tortiously interfered with a "Noncompetition and Nondisclosure Agreement" ("noncompete agreement") between Frey and Bauernhuber. The circuit court ultimately granted Frey's motion for summary judgment after concluding that: (1) Frey was entitled to summary judgment as a matter of law on its tortious interference with contract claim; (2) disgorgement of Hasheider's profits during the relevant time period was an appropriate remedy; and (3) Hasheider was liable for Frey's attorney fees incurred in Frey's previous lawsuit against Bauernhuber for his breach of the noncompete agreement. Hasheider appeals the court's written order encompassing its summary judgment decisions, arguing that material issues of fact exist as to whether it acted with the requisite intent to interfere with the noncompete agreement; disgorgement is not an appropriate remedy for tortious interference with contract claims; even if disgorgement is an appropriate remedy, a causal connection between the amount awarded and Hasheider's alleged conduct does not exist; and the court erred by permitting Frey to collect attorney fees from the previous lawsuit against Bauernhuber.

¶2 On appeal, we conclude that material issues of fact exist regarding whether Hasheider intentionally interfered with the noncompete agreement, and the circuit court therefore erred by granting Frey's summary judgment motion on that issue. Specifically, a reasonable jury could conclude that Hasheider did not know, nor should it have known, that interference with the noncompete agreement was certain, or substantially certain, to occur. A jury could so find because Hasheider hired Bauernhuber only after Hasheider's owner received information from Bauernhuber and Bauernhuber's attorney that Frey and Bauernhuber had settled their lawsuit and that Hasheider "should be able to hire" Bauernhuber. Accordingly, we reverse the court's grant of summary judgment and remand with directions consistent with this decision.

¶3 Although we need not address the remaining issues, in light of our reversal of the circuit court's grant of summary judgment on Frey's tortious interference claim, we choose to do so. In the event the lawsuit proceeds to a trier of fact, and that fact finder determines that Hasheider acted with the requisite intent, then the parties will be placed in substantially the same position as they are now (with respect to disgorgement and attorney fees). *See State v. Rushing*, 197 Wis. 2d 631, 649-50, 541 N.W.2d 155 (Ct. App. 1995) (stating that when remanding for a new trial, we may address nondispositive issues "in the interest of judicial economy if the issues are likely to arise" again in the same case). Moreover, whether disgorgement is a proper remedy for tortious interference with contract claims, and whether there exists a causal connection between the disgorgement award and a party's alleged wrongdoing, are matters of first impression in Wisconsin.

¶4 As explained below, we conclude that disgorgement is an appropriate remedy under the facts of this case and that there was a causal connection between Hasheider's alleged tortious interference and the damages awarded. We further conclude that the circuit court properly awarded Frey the attorney fees it incurred in its prior litigation against Bauernhuber.

**BACKGROUND**

¶5 Frey and Hasheider are separate construction companies headquartered in Sauk County. Each company provides exterior construction services. In July 2016, Frey promoted Bauernhuber to its director of sales position. Bauernhuber signed a noncompete agreement when he accepted the position. The noncompete agreement provided that Bauernhuber was restricted from providing competitive goods or services within an area geographically limited to Dane, Sauk, Columbia, and Iowa counties. Additionally, the noncompete agreement stated that

the restrictions applied during Bauernhuber's employment with Frey and extended after the termination of his employment for a period equal to the number of days he worked for Frey, up to a maximum period of eighteen months.

¶6 As relevant to this appeal, the noncompete agreement defined the prohibited "[c]ompetitive [g]oods and [s]ervices" as "those products and services [Frey] use[d] in its business relating to roofing, siding, remodeling, and any other type of construction carried on by [Frey] while [Bauernhuber] was employed by [Frey]." The noncompete agreement also prohibited Bauernhuber from soliciting Frey's customers with whom he—or an employee whom he supervised—had direct contact on behalf of Frey, or those customers whom Bauernhuber had obtained nonpublic information about while employed by Frey for the purpose of causing such customers to contract with a competitor or not to do business with Frey. In addition, the noncompete agreement required Bauernhuber to disclose the terms of the noncompete agreement to any future employer during the period in which the restrictions contained therein applied.

¶7 In September 2017, Bauernhuber resigned from Frey after working as its director of sales for approximately fourteen months. Based on Bauernhuber's resignation date, he was subject to the restrictions in the noncompete agreement until November 2018.

¶8 Thereafter, in September or October 2017, Bauernhuber began working for Hasheider as its vice president of sales for residential projects. Bauernhuber testified at a deposition that Hasheider offered him the position in July or August 2017. Bauernhuber further testified that he provided Hasheider with a copy of the noncompete agreement prior to his employment with the company.

¶9   Brad Hasheider,[1] the owner of Hasheider, testified at a deposition that Hasheider terminated Bauernhuber's employment "several weeks" after Bauernhuber began working for the company. According to Brad, Hasheider terminated Bauernhuber after learning of the noncompete agreement. Specifically, he testified that Scott Frey, the owner of Frey, called him to inform him of the noncompete agreement, at which point Brad terminated Bauernhuber. Brad stated that he was previously unaware of the noncompete agreement, but he admitted that he was aware Frey's employees sometimes had such agreements in place.

¶10   In November 2017, Frey sued Bauernhuber for breach of contract, alleging that he violated the noncompete agreement ("2017 lawsuit"). In August 2018, Frey and Bauernhuber reached a settlement ("settlement agreement"), in which Bauernhuber agreed to pay Frey $2,100 in return for a release of all claims against Bauernhuber relating to the noncompete agreement. A circuit court dismissed the lawsuit the following month in accordance with the settlement agreement.

¶11   Hasheider rehired Bauernhuber in March 2018.[2] Brad testified that Bauernhuber orally informed him—prior to Hasheider rehiring Bauernhuber—that the lawsuit was "settled." In addition, Brad stated that he called Bauernhuber's attorney before rehiring Bauernhuber. According to Brad, the attorney stated that the lawsuit was "dismissed and [that] we should be able to hire [Bauernhuber]."

---

[1] Because Brad Hasheider's surname is the name of a company involved in this dispute, we refer to him individually using his first name where appropriate.

[2] In the present lawsuit, Frey contended that Bauernhuber continued to work for Hasheider even after Hasheider learned of the noncompete agreement in September or October 2017. Frey and Hasheider later signed a stipulation in which Frey agreed to withdraw its claim for tortious interference with the noncompete agreement for the period from September or October 2017 to March 2018.

¶12    In February 2019, Frey filed the present lawsuit against Hasheider. Frey alleged that Hasheider tortiously interfered with the noncompete agreement, and it requested monetary damages. Frey also requested "attorney fees as special damages that were incurred in [the 2017 lawsuit] directly caused by Hasheider's interference with the [noncompete] agreement."

¶13    During the discovery process, Frey requested from Hasheider information related to Hasheider's profits from projects on which Bauernhuber had worked. Frey then informed Hasheider that it was seeking disgorgement of Hasheider's profits. Later, the parties entered into a stipulation whereby they agreed that if Hasheider were found liable for tortious interference with the noncompete agreement, and if the circuit court determined that disgorgement of Hasheider's profits was an appropriate remedy, then "the calculation of Hasheider's profit for disgorgement damages shall be eleven percent of Hasheider's gross revenue that" is determined "to be associated with the tortious interference."

¶14    Frey filed a motion for summary judgment. Frey argued, in pertinent part, that the circuit court should conclude that the undisputed facts make Hasheider liable for tortious interference with the noncompete agreement, conclude that disgorgement was an appropriate remedy, and find Hasheider liable for Frey's attorney fees from the 2017 lawsuit. Frey provided evidence from an accountant, who determined that Frey would be entitled to $77,754.51 in disgorgement damages. This figure was determined using the eleven percent figure from the parties' stipulation and Hasheider's financial records from March 2018 to November 2018. In particular, the figure used Hasheider's revenue from every project during that period that in some way involved Bauernhuber and that was within the geographic limit imposed by the noncompete agreement. Regarding

Frey's request that the court award attorney fees it incurred in the 2017 lawsuit, Frey relied on the "third-party litigation exception" to the "American Rule."

¶15 At a subsequent hearing on Frey's motion, Hasheider argued that there remained issues of material fact that precluded summary judgment. In particular, citing Brad's testimony outlined above, *see supra* ¶9, Hasheider asserted that it remained disputed whether Hasheider intentionally interfered with the noncompete agreement—i.e., whether Hasheider knew, or reasonably should have known, when it rehired Bauernhuber that the noncompete agreement was still in effect. Hasheider conceded that the settlement agreement did not include any language to the effect that the noncompete agreement was "null, invalid, [or] d[id] not remain in place."

¶16 The circuit court also heard argument from the parties regarding Frey's ability to receive disgorgement as a remedy under the law and to what extent the court could grant summary judgment on that requested relief. Hasheider argued:

> What the [settlement] agreement says is that if the court finds that there is causation between the actual tort that is found by the court and each project, that they would include that. So if the court is finding that each project that [Bauernhuber] worked on regardless of his acts in procuring those types of projects is a tort, then the damages would be all of that. But if the court finds that, for example, one project had nothing to do with the efforts of Mr. Bauernhuber and, therefore, there is no causation, then that would not be included in the total damages.

Frey responded, arguing that there were no issues of material fact relating to the projects included in the accounting. Frey stated that the noncompete agreement prevented Bauernhuber "from providing any kind of competitive goods or services, whether as a supervisor or personally."

7

¶17 In an oral ruling, the circuit court granted partial summary judgment to Frey, concluding that Hasheider, as a matter of law, tortiously interfered with the noncompete agreement between March 2018 and November 2018. The court reasoned that the only disputed issue on this claim was whether Hasheider intentionally interfered with the noncompete agreement. According to the court, this issue "boil[ed] down to" whether Hasheider's reliance on Bauernhuber's attorney "verbally saying that the noncompete [agreement] was being settled between [Frey] and Bauernhuber" was "reasonable enough that [Hasheider] could rehire Bauernhuber and not be found to be intentionally interfering with the noncompete agreement that [Hasheider] knew was in existence back in October of 2017."

¶18 The circuit court noted that there "is no dispute that [Hasheider] never requested or reviewed any documents, including the settlement agreement … or the dismissal of the suit between [Frey] and Bauernhuber…. In essence, [Hasheider] never verified whether or not the settlement agreement referenced the noncompete agreement." The court concluded that Hasheider "made a lot of assumptions which were not reasonable in the court's assessment of the facts and the law."

¶19 Furthermore, the circuit court granted Frey summary judgment on the disgorgement issue, determining that such relief was an appropriate remedy in this case and that there were no material issues of fact as to causation. The court explained that Frey demonstrated, at the very least, that Bauernhuber "had some involvement" in the projects listed in the accounting. The court stated that it was "satisfied that any involvement, whether great or small, by Mr. Bauernhuber to any jobs that ultimately benefited [Hasheider]" should be considered in the disgorgement award.

8

¶20 Following additional filings by the parties, the circuit court granted Frey's motion for summary judgment for attorney fees Frey incurred in its 2017 lawsuit against Bauernhuber, concluding that the third-party litigation exception to the American Rule applied because Hasheider's tortious interference with the noncompete agreement "forced [Frey] to sue [Bauernhuber] for breach of contract." The court then entered a final order encompassing its previous decisions in the case, which included a total award and judgment in favor of Frey, and against Hasheider, for $86,432.15.[3] Hasheider now appeals.

## DISCUSSION

¶21 On appeal, Hasheider argues that the circuit court erred by: granting summary judgment to Frey on its tortious interference with a contract claim; awarding disgorgement damages; and awarding Frey attorney fees it incurred in the 2017 lawsuit. "We review an order for summary judgment de novo, using the same methodology as the circuit court." *Yahnke v. Carson*, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2021-22).[4]

---

[3] The total award amount was comprised of $77,754.51 for disgorgement damages and $8,677.64 in attorney fees from the 2017 lawsuit.

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## I. Tortious interference with contract

¶22    Hasheider asserts that summary judgment was inappropriate because there remain genuine issues of material fact as to whether it, in fact, intentionally interfered with the noncompete agreement.  It also argues that the record does not support a causal connection between Hasheider's actions and the remedy awarded.  To that end, Hasheider contends that disgorgement is not an appropriate or recognized remedy in Wisconsin for intentional interference with contract claims.

¶23    We agree with Hasheider that the circuit court erred by granting summary judgment to Frey on its tortious interference with contract claim because there remain genuine issues of fact regarding Hasheider's intent, which is an element of that claim.  However, we further conclude that disgorgement may be an appropriate remedy for an intentional interference with contract claim.  Under the facts of this case, the court did not erroneously exercise its discretion by permitting Frey to seek disgorgement as a remedy, and the undisputed facts demonstrate a causal connection between the alleged interference and the damages awarded to Frey.

### A.  Intent to interfere

¶24    The elements of a claim for tortious interference with contract are:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Briesemeister v. Lehner*, 2006 WI App 140, ¶48, 295 Wis. 2d 429, 720 N.W.2d 531; *see also* WIS JI—CIVIL 2780 (2024).  To prove that a defendant intentionally

interfered with a contract, a plaintiff must show that the defendant acted with the purpose to interfere with the contract. *Augustine v. Anti-Defamation League of B'Nai B'Rith*, 75 Wis. 2d 207, 219-20, 249 N.W.2d 547 (1977) (citation omitted). "If an actor lacks the 'purpose to interfere' then his or her 'conduct does not subject [him or her] to liability even if it has the unintended effect of deterring [a third party] from dealing with the [plaintiff].'" *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 788, 541 N.W.2d 203 (Ct. App. 1995) (alterations in original; citation omitted). "Liability will only be found when the actor 'knew that the interference was certain, or substantially certain, to occur.'" *Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 457, 597 N.W.2d 462 (Ct. App. 1999) (citation omitted). "Generally, intent is a factual issue for the trier of fact, and only when the facts are such that no other reasonable inference may be drawn may the [circuit] court find intent or lack of intent as a matter of law." *Id.*

¶25     Here, it is undisputed that the settlement agreement between Frey and Bauernhuber was not entered into until August 2018, that the 2017 lawsuit was not dismissed until September 2018, and that nothing in the noncompete agreement or the settlement agreement permitted Hasheider to employ Bauernhuber during the noncompete period. Moreover, Hasheider—specifically, Brad—clearly knew of the noncompete agreement in the fall of 2017.

¶26     Critically, however, Brad testified that in March 2018 he attempted to ascertain whether Hasheider could legally rehire Bauernhuber. According to Brad, both Bauernhuber and Bauernhuber's attorney informed him that the 2017 lawsuit was settled. Brad testified that Bauernhuber's attorney informed him that Hasheider "should be able to" legally rehire Bauernhuber due to the settlement agreement. Only then did Hasheider rehire Bauernhuber. Also potentially relevant to a fact finder's consideration is that Hasheider claims that it originally terminated

11

Bauernhuber's employment in September or October 2017, once it discovered that he was subject to the noncompete agreement. On these facts, a jury could reasonably find that Hasheider did not know that any interference with the noncompete agreement was certain, or substantially certain, to occur because it thought the noncompete agreement was no longer effective.

¶27     Frey argues—and the circuit court determined—that Hasheider was required, as a matter of law, to conduct further investigation to determine whether the noncompete agreement was still in effect in March 2018. In support, Frey cites *Sweeney v. Stenjem*, 271 Wis. 497, 498, 74 N.W.2d 174 (1956), in which a development company accepted a written offer from Sweeney to purchase two lots, conditioned upon a zoning change. Thereafter, Sweeney's petition to change the zoning designation for the lots was denied. *Id.* at 499. Sweeney then informed the president of the development company of the denial, to which the president responded that he "thought that he could get the zoning changed." *Id.* Sweeney "told him to go ahead" and stated that he was "all for the deal." *Id.* Several months later, the president of the development company successfully had the zoning changed. *Id.* at 500. Despite the contract with Sweeney, the development company accepted an offer to purchase the lots made by Stenjem, a separate prospective buyer. *Id.* Sweeney sued Stenjem for maliciously inducing another to break a contract with a third person. *Id.*

¶28     At trial, Stenjem testified that, prior to the completed offer to purchase the lots, the president of the development company "mentioned that he had had a former offer or contract which was now null and void." *Id.* at 502. According to Stenjem, he then called the development company's attorney, "who informed him of the efforts of Mr. Sweeney … to get the zoning changed, which had failed, and of the successful efforts of [the development company's president]." *Id.* The

attorney also told Stenjem that "in his opinion, Sweeney 'had given up hopes of achieving the zoning change and it was [his] opinion that in … Sweeney's mind his relationship had terminated with [the development company].'" ***Id.*** A jury ultimately found Stenjem liable. ***Id.*** at 500.

¶29 On appeal, Stenjem argued that Sweeney failed to demonstrate that Stenjem had the requisite intent to interfere with the contract between Sweeney and the development company. ***Id.*** Our state supreme court concluded that Stenjem's "fraudulent intent is inferred from the fact that [Stenjem], having knowledge of the existence of [Sweeney's] contract, proceeded to consummate a deal which destroyed [Sweeney's] rights under that contract." ***Id.*** at 501. The court stated that Stenjem "knew that Sweeney had had a contract with [the development company] and that it was conditioned upon the property being rezoned; he also knew that the property had in fact been rezoned." ***Id.*** at 502. "[T]his knowledge was such as would put a prudent man on inquiry, and supports the jury's finding in that respect." ***Id.*** at 502-03. Notably, the court stated that the "very fact that" the development company's president and the attorney "had informed [Stenjem] that Sweeney's contract had been terminated constituted notice of the existence of such contract, and it was incumbent upon [Stenjem] to make such inquiry as would apprize him of the true facts." ***Id.*** at 503.

¶30 The supreme court further determined that the jury's verdict was supported by sufficient evidence demonstrating that Stenjem did not use ordinary diligence in ascertaining Sweeney's interests. ***Id.*** at 504. The court explained, "[Stenjem] admitted that he did not call [Sweeney], the one person who could have given him reliable information regarding the existence of the contract; he gave no reason for failing to do so …." ***Id.*** Moreover, "[t]he information [Stenjem] received

from [the development company's president] was purely voluntary"—that is, Stenjem did not solicit the information. *Id.*

¶31 The facts in *Sweeney* are materially distinguishable from those present here. In particular, Hasheider does not argue that it lacked knowledge of the existence of the noncompete agreement. Rather, the question is whether Hasheider knew, or should have known, that the noncompete agreement was still in effect—i.e., whether rehiring Bauernhuber was certain, or substantially certain, to interfere with the noncompete agreement. To answer this question, it is necessary to determine whether Hasheider conducted sufficient investigation into the 2017 lawsuit to (incorrectly) ascertain that it could rehire Bauernhuber. Resolving this question requires the weighing of competing facts, inferences, and the parties' credibility, all of which are improper on summary judgment.

¶32 Furthermore, in *Sweeney*, the supreme court reviewed an appeal from a jury's verdict, which presents a much more deferential standard of review than the one we face on review of the circuit court's summary judgment decision. *See id.* at 502; *Reuben v. Koppen*, 2010 WI App 63, ¶19, 324 Wis. 2d 758, 784 N.W.2d 703. The *Sweeney* court reviewed whether there was sufficient evidence before the jury to find that Stenjem intended to interfere with the contract and failed to exercise ordinary diligence in ascertaining Sweeney's interests. The court in *Sweeney* did not hold, as a matter of law, that a defendant's reliance on inaccurate statements from a third party or that party's attorney will always demonstrate the requisite intent to interfere with a contract. To the contrary, when there are reasonable inferences supporting a finding that a defendant did not know that such interference was certain, or substantially certain, to occur as a result of his or her acts, the issue is not ripe for summary judgment. *See Dorr*, 228 Wis. 2d at 457.

14

¶33 Reasonable inferences support a finding that Hasheider did not have the requisite intent to interfere with the noncompete agreement. That is, a trier of fact could find that Hasheider reasonably relied on assurances made by Bauernhuber and Bauernhuber's attorney. To determine whether Hasheider reasonably relied on these statements, a trier of fact must weigh competing facts, inferences, and the parties' credibility. We therefore reverse the circuit court's order granting summary judgment to Frey.

### B. Causal connection and disgorgement

¶34 Hasheider argues that disgorgement is not an appropriate or recognized remedy in Wisconsin for intentional interference with contract claims and that the record does not support a causal connection between Hasheider's actions and the remedy awarded. According to Hasheider, Frey alleged that during the noncompete agreement's duration, Bauernhuber issued only one competing bid against Frey, and there is no evidence that Bauernhuber was using his prior relationship with Frey to take away business from Frey. Hasheider asserts that "[t]he majority of Bauernhuber's work for Hasheider was taking a lead, which primarily came from people calling Hasheider directly, and selling the project to the lead." Hasheider further alleges that "[t]here is no evidence in the record that Frey had a dip in business, lost profits, or lost out on any specific project."

¶35 The proper standard for measuring damages is a question of law that we review de novo. *Hills Bros. Coffee, Inc. v. Dairyland Transp., Inc.*, 157 Wis. 2d 645, 648, 460 N.W.2d 433 (Ct. App. 1990). We review a circuit court's decision to award equitable damages under an erroneous exercise of discretion standard. *See Associated Bank NA v. Collier*, 2014 WI 62, ¶22, 355 Wis. 2d 343, 852 N.W.2d 443. "An erroneous exercise of discretion occurs when the circuit court

fails to exercise discretion, the facts fail to support the court's decision or the circuit court applies the wrong legal standard." **Id.**

¶36 Wisconsin precedent demonstrates that available remedies for a successful tortious interference with contract claim may include the pecuniary loss of benefits from the contract, consequential losses, emotional distress or actual harm to reputation, and punitive damages.[5] *See* **Musa v. Jefferson Cnty. Bank**, 2001 WI 2, ¶¶29, 32, 35, 240 Wis. 2d 327, 620 N.W.2d 797; 14 JAY E. GRENIG, WISCONSIN PRACTICE SERIES: ELEMENTS OF AN ACTION § 16:7 (2024-25 ed.); RESTATEMENT (SECOND) OF TORTS, § 744A (1979). Frey argues, as it did in the circuit court, that disgorgement should also be recognized as a proper remedy for a successful tortious interference with contract claim, asserting that such a holding would be consistent with "general tort damages principles" and "case law from other jurisdictions." For the reasons explained below, we agree with Frey that disgorgement damages may be awarded as a remedy for a successful tortious interference with contract claim.

¶37 Unlike damages available for breach of contract claims, "[i]n tort actions the tortfeasor is liable for all injuries resulting directly from the tort committed whether they were within the contemplation of the parties or not." **Morse Chain Co. v. T.W. Meiklejohn, Inc.**, 241 Wis. 45, 52, 4 N.W.2d 162 (1942). In some circumstances, Wisconsin courts permit restitution as a remedy for successful tort claims, "which is measured by '[a] defendant's gain or benefit.'" **Pro-Pac, Inc. v. WOW Logistics Co.**, 721 F.3d 781, 786 (7th Cir. 2013) (quoting **Ludyjan v. Continental Cas. Co.**, 2008 WI App 41, ¶8, 308 Wis. 2d 398, 747

---

[5] Hasheider appears to argue that the issue of disgorgement was not properly alleged by Frey, stating that Frey failed to seek the remedy in its complaint. Hasheider cites no authority in support of this argument, and we will not address the issue further. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

N.W.2d 745); *see also* 1 DAN B. DOBBS, LAW OF REMEDIES § 4.1(1) (2d ed. 1993). For example, Wisconsin permits claims for unjust enrichment, which "is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Sands v. Menard*, 2017 WI 110, ¶30, 379 Wis. 2d 1, 904 N.W.2d 789 (citation omitted).

¶38    "Wisconsin law does not limit restitution to merely unjust enrichment claims." *Pro-Pac*, 721 F.3d at 786.  Rather, Wisconsin law "also allows plaintiffs to receive restitution as compensation for tort claims." *Id.*  As is relevant here, disgorgement, traditionally considered an equitable remedy, "is a form of '[r]estitution measured by the defendant's wrongful gain.'"[6] *See Kokesh v. SEC*, 581 U.S. 455, 458-59 (2017) (alteration in original) (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. a (AM. L. INST. 2010)); *Liu v. SEC*, 591 U.S. 71, 80 (2020).[7]

---

[6] As was recently recognized by the United States Supreme Court, the term "disgorgement" is of "relatively recent vintage," although the principle itself has been applied historically by some jurisdictions under different names, including "[r]estitution," "[a]ccounting," and "unjust enrichment." *See Liu v. SEC*, 591 U.S. 71, 76 n.1, 79 (2020); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. a (AM. L. INST. 2011).

[7] In *Country Visions Cooperative v. Archer-Daniels-Midland Co.*, 2020 WI App 32, 392 Wis. 2d 672, 946 N.W.2d 169, *aff'd on other grounds*, 2021 WI 35, 396 Wis. 2d 470, 958 N.W.2d 511, we stated "that disgorgement … is generally unavailable in a breach of contract or tortious interference with contract dispute." *Id.*, ¶46 (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 39, 44, 49, 51 (AM. L. INST. 2011)).  We question whether we are bound by this statement.  The plaintiffs in that case petitioned our state supreme court for review of our decision, which the court granted.  On appeal, the supreme court affirmed our decision, albeit, on different grounds.  *See Country Visions Coop.*, 396 Wis. 2d 470, ¶6; *Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

¶39    If ordered as a remedy, "[d]isgorgement requires that the defendant give up 'those gains … properly attributable to the defendant's interference with the claimant's legally protected rights.'"  **Kokesh**, 581 U.S. at 459 (alteration in original; citation omitted).  Disgorgement is used when "a claimant potentially recovers more than a provable loss so that the defendant may be stripped of a wrongful gain."  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 3 cmt. a. (AM. L. INST. 2011).  "The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty."  **Id.**, § 51.  "The value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value."  **Id.**  "A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain."  **Id.**

---

Even so, in **Country Visions Cooperative**, we went on to conclude that disgorgement—or some form of disgorgement as applied by the circuit court—was a proper remedy for the plaintiff's contract and tortious interference claims.  See **Country Visions Coop.**, 392 Wis. 2d 672, ¶¶45-47.  Elsewhere, discussing RESTATEMENT (SECOND) OF TORTS § 774A, which lists available damages for tortious interference with contract claims, this court has stated:

> [A]lthough we have adopted the RESTATEMENT (SECOND) OF TORTS § 766 relating to the elements of the tort of intentional interference with performance of contract by third person, and have referred to RESTATEMENT (SECOND) OF TORTS § 774A in passing … , no published Wisconsin decision has adopted § 774A.

**Musa v. Jefferson Cnty. Bank**, 2000 WI App 33, ¶15, 233 Wis. 2d 241, 607 N.W.2d 349, *rev'd and remanded on other grounds*, 2001 WI 2, 240 Wis. 2d 327, 620 N.W.2d 797 (citations omitted).  Moreover, the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT and the RESTATEMENT (SECOND) OF TORTS § 774A each take no outward position on permitting restitution—or disgorgement specifically—in tortious interference claims.  Likewise, they take no express position on disallowing such a remedy, either.  See **Sandare Chem. Co. v. WAKO Int'l, Inc.**, 820 S.W.2d 21, 24 (Tex. Ct. App. 1991).

¶40　"Courts have recognized that some apportionment must be made between those profits attributable to the plaintiff's property and those earned by the defendant's efforts and investment, limiting the plaintiff to the profits fairly attributable to his [or her] share." *EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*, 900 P.2d 113, 120 (Colo. 1995) (quoting 1 DOBBS, LAW OF REMEDIES § 4.5(3) (2d ed. 1993)). Disgorgement is not intended to penalize, and "[e]ven the willful wrongdoer should not be made to give up that which is his [or her] own; the principle is disgorgement, not plunder." *See id.* (second alteration in original; citation omitted). In essence, a "court must determine which part of the profit results from the defendant's own independent efforts and which part results from the [wrongfully obtained] benefits [from] the plaintiff." *See id.* at 120-21.

¶41　In *Northern Air Services, Inc. v. Link*, No. 2008AP2897, unpublished slip op. ¶¶1-2 (WI App Jan. 18, 2012),[8] this court overturned a circuit court's decision limiting the evidence a claimant "could present to a jury regarding his theory of damages relating to his" tort-based "breach of fiduciary duty claims." The circuit court there had "determined that [the claimant's] recovery was limited to compensatory damages that would return him to a pre-breach state." *Id.*, ¶6.

¶42　Quoting the RESTATEMENT (SECOND) OF TORTS § 903 (1979), we stated:

> In cases in which a tortfeasor has received from the commission of a tort against another person a benefit that constitutes unjust enrichment at the expense of the other, he [or she] is ordinarily liable to the other, at the latter's election, either for the damage done to the other's interests

---

[8] *See* WIS. STAT. RULE 809.23(3)(b) (permitting the citation of authored, unpublished opinions issued on or after July 1, 2009, for their persuasive value).

> *or for the value of the benefit received through the commission of the tort.*

*Northern Air Servs.*, No. 2008AP2897, ¶16 (emphasis added; footnote omitted).[9] We concluded that "the duty of loyalty" attached to a fiduciary relationship "demands that a fiduciary be compelled to disgorge any profits received as a result of the breach." *Id.*, ¶17. Our holding in *Northern Air Services* is consistent with prior decisions by our state supreme court. *See Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 580, 586, 289 N.W.2d 280 (1980) (concluding that an employee who breached his fiduciary duty to his employer may be required, "in addition to returning the misappropriated funds, [to] forfeit all right to the compensation he received while he was misappropriating funds"); *see also Dick & Reuteman Co. v. Doherty Realty Co.*, 16 Wis. 2d 342, 356, 114 N.W.2d 475 (1962) (approving disgorgement as a remedy in another breach of fiduciary action).

¶43      The weight of authority from other jurisdictions demonstrates that the claimant may elect to pursue disgorgement as a proper remedy for successful tortious interference with contract claims. *See, e.g.*, *Zippertubing Co. v. Telefax Inc.*, 757 F.2d 1401, 1411-12 (3d Cir. 1985); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 691 n.12 (10th Cir. 1989) ("[T]he weight of authority holds that restitutionary damages are available for tortious interference with contract."); *Federal Sugar Ref. Co. v. United States Sugar Equalization Bd., Inc.*, 268 F. 575, 582-83 & n.1 (D.C.N.Y. 1920); *National Merchs. Corp. v.*

---

[9] We explained that the term "unjust enrichment" as used in RESTATEMENT (SECOND) OF TORTS § 903 (AM. L. INST. 1979), "plainly refers to unjust enrichment as a concept in damages law, not as a formal legal claim." *Northern Air Servs., Inc. v. Link*, No. 2008AP2897, unpublished slip op. ¶16 n.6 (WI App Jan. 18, 2012).

*Leyden*, 348 N.E.2d 771, 775-76 (Mass. 1976).[10] We conclude that this is a proper statement of the law and adopt it in this case.

¶44 Moreover, public policy supports allowing a party that successfully proves a claim for tortious interference with contract to collect disgorgement as a remedy. First, "it will often be difficult to satisfy strictly a conventional tort formula" when calculating damages for tortious interference with contract claims. *National Merchs.*, 348 N.E.2d at 776. This difficulty exists because developing a formula for pecuniary losses from such tortious action is largely speculative. *See generally Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 924-26 (8th Cir. 2005); *see also Reiman Assocs., Inc. v. R/A Advert., Inc.*, 102 Wis. 2d 305, 325-26, 306 N.W.2d 292 (Ct. App. 1981) (reasoning that there are cases in which a "substantial pecuniary loss has occurred" but the loss "is of such a character that the amount of money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it" (citation omitted)).

¶45 Second, but relatedly, much like the policies behind punitive damages and unjust enrichment, disgorgement is "consistent with the policy of discouraging tortious conduct by depriving the tortfeasor of the opportunity to profit from wrongdoing." *See Zippertubing*, 757 F.2d at 1411; *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 234, 291 N.W.2d 516 (1980) (stating that punitive damages "are

---

[10] Although Hasheider has cited few examples, our independent research shows that a number of jurisdictions have refused to adopt disgorgement as proper remedies for tortious interference with contract claims. *See, e.g.*, *TruGreen Cos. v. Mower Brothers, Inc.*, 199 P.3d 929, 934-35 (Utah 2008); *American Air Filter Co. v. McNichol*, 527 F.2d 1297, 1300-01 (3d Cir. 1975).

We are unpersuaded by these authorities, largely based on the public policy reasons we will articulate, *see infra* ¶¶44-46, and because tort remedies are not limited in the same manner as remedies available for contract claims.

allowed for purposes of public policy to punish the wrongdoer and to deter him [or her] and others from future similar wrongdoing"); *Sands*, 379 Wis. 2d 1, ¶30. Similarly, disgorgement may deter "an intending tortfeasor" from "speculat[ing] that his [or her] profits might exceed the injured party's losses," thus discouraging commission of the tort for economic reasons. *National Merchs.*, 348 N.E.2d at 776. In the employment context, an employer may be encouraged to hire another employer's employee in violation of a known noncompete agreement because even if the new employer is ordered to reimburse the former employer for its lost profits, the new employer could retain the funds earned that are over and above what it is ordered to pay. Disgorgement discourages this type of behavior.

¶46 The above policy points are particularly true because tortious interference with contract involves proving intentional—as opposed to negligent—interference. *See Briesemeister*, 295 Wis. 2d 429, ¶48. Thus, although the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT "t[akes] no position" on an "unjust enrichment measure" "for contract interference, … the current is strong for allowing such a remedy in proper cases." *National Merchs.*, 348 N.E.2d at 776 n.16.

¶47 Here, Frey alleged that Hasheider tortiously interfered with the noncompete agreement. The above-noted public policies point in favor of permitting disgorgement damages under the facts of this case for several reasons. It would be difficult for Frey to calculate lost profits from Hasheider's alleged wrongdoing because the noncompete agreement did not prevent Bauernhuber from leaving his employment with Frey. Thus, absent disgorgement as a remedy, Frey would need to prove that it suffered lost profits using a formula that did not account for Frey's lost business simply due to Bauernhuber leaving the company. In addition, Frey's lost profits may not account for its actual losses. According to

Frey's allegations in the circuit court, it lost customer relationships, business, time, and resources as a result of Hasheider's interference, which may be difficult to calculate and prove as compensatory damages.

¶48    Furthermore, disgorgement will deter Hasheider from tortiously interfering with Frey's noncompete agreements in the future.  As Frey argues on appeal, if the allegations are proven, Frey was left in a poorer business position than it occupied prior to the interference, while Hasheider was left in a better position if it is ordered only to reimburse Frey for Frey's lost profits.[11]  If disgorgement were not available, Hasheider could be incentivized to hire other current or former employees of Frey's in violation of known noncompete agreements because even if Hasheider were ordered to pay for Frey's lost profits, it could still retain a benefit. We therefore conclude that the circuit court in this case did not erroneously exercise its discretion by permitting Frey to seek disgorgement as a remedy for its tortious interference with contract claim.

¶49    In addition, assuming tortious interference is proven, the circuit court properly attributed Hasheider's unlawful conduct to the projects in the accounting provided by Frey because there was a causal connection between Hasheider's alleged interference and the damages awarded.  It is well-settled Wisconsin law that "[c]ausation exists … where the defendant's actions are a 'substantial factor' in producing the harm to the plaintiff." ***Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.***, 2005 WI App 217, ¶15, 287 Wis. 2d 560, 706 N.W.2d 667 (citation omitted).  The court awarded Frey $77,754.51 in damages, which

---

[11] Hasheider contends that it should not be liable for disgorgement because the circuit court found that it "did not act maliciously."  We are unpersuaded by Hasheider's argument.  The fact remains that—if proven—Hasheider acted with the *intent* to interfere with the noncompete agreement.

represented eleven percent of Hasheider's revenue from every project from March 2018 to November 2018 that in some way involved Bauernhuber and that was within the geographic limit imposed in the noncompete agreement. In granting the award, the court stated that it was "satisfied that any involvement, whether great or small, by Mr. Bauernhuber to any jobs that ultimately benefited [Hasheider]" during the relevant period should be considered in the disgorgement award.

¶50 We adopt the summary of the noncompete agreement provided by Frey: the agreement "not only restrict[ed] Bauernhuber from soliciting Frey's former customers, it also restrict[ed] Bauernhuber from providing any '[c]ompetitive [g]oods and [s]ervices' … regardless of whether those services were to Frey's former customers." "Competitive [g]oods and [s]ervices" were defined in the noncompete agreement as "those products and services [Frey] use[d] in its business relating to roofing, siding, remodeling, and any other type of construction carried on by [Frey] while [Bauernhuber] was employed by [Frey]." Thus, the issue with respect to causation in this case is whether Frey suffered damage as a result of Hasheider's alleged tortious interference with the noncompete agreement by hiring Bauernhuber to solicit Frey's clients and to provide competitive goods and services. If Hasheider is found to have tortuously interfered with the noncompete agreement, Frey clearly suffered damages as shown in the accounting. The amount of disgorgement damages, calculated by stipulation and based upon eleven percent of Hasheider's profit derived from a project that in some way involved Bauernhuber's providing "[c]ompetitive [g]oods and [s]ervices" within the geographic limit imposed in the noncompete agreement, were therefore proper.

¶51 Hasheider does not seriously argue that the projects used in the disgorgement award were not in some way related to Bauernhuber providing "[c]ompetitive [g]oods and [s]ervices" in the relevant geographic area. Nor did

Hasheider provide any more detailed information to Frey than a list of projects with which Bauernhuber was somehow, and to some extent, involved. *See Reiman*, 102 Wis. 2d at 325-26. We therefore conclude that if, on remand, it is determined that Hasheider tortiously interfered with Frey's contract with Bauernhuber, there is a clear causal connection between that tortious interference and Frey's damages, such that Frey is entitled to the disgorgement damages calculated pursuant to the parties' stipulation.

¶52 Hasheider also contends that the circuit court erred by awarding disgorgement damages for the entire period from March 2018 to November 2018. Hasheider asserts that the court should have awarded disgorgement, if at all, from March 2018 to August 21, 2018—the date that Bauernhuber and Frey settled the 2017 lawsuit—because Frey failed to mitigate its damages by permitting Bauernhuber to remain employed at Hasheider after the settlement agreement.

¶53 The issue of Frey's alleged failure to mitigate was raised for the first time, albeit not expressly, at the summary judgment hearing. Specifically, Hasheider argued that "in the event the [circuit] court does grant damages [from March 2018 to November 2018], we request that the court find that Frey would be unjustly enriched by accepting those damages from August 21st … until November of 2018," due to Frey's knowledge that Bauernhuber was working at Hasheider.

¶54 "[F]ailure to mitigate damages is an affirmative defense which must be raised by answer or be deemed waived." *Sprecher v. Weston's Bar, Inc.*, 78 Wis. 2d 26, 47, 253 N.W.2d 493 (1977); *see also* WIS. STAT. § 802.02(3); *cf.* WIS. STAT. § 802.06(2)(a). Hasheider therefore waived its failure to mitigate defense by not raising it in its answer. Accordingly, we will not further consider the issue, including whether failure to mitigate is a recognized affirmative defense to tortious

interference with contract. *See Maple Grove Country Club, Inc. v. Maple Grove Ests. Sanitary Dist.*, 2019 WI 43, ¶56, 386 Wis. 2d 424, 926 N.W.2d 184.

¶55      Hasheider claims that it could not have waived the affirmative defense because Frey failed to raise a waiver argument at the summary judgment hearing, and Frey did not claim disgorgement when it filed its complaint. We reject these arguments on two bases. First, even if we had the authority to overlook WIS. STAT. § 802.02(3) and the above-cited case law on the basis of forfeiture, a respondent, like Frey, can raise additional arguments not raised previously as grounds for affirming a circuit court's decision on appeal. *See Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶27 n.4, 326 Wis. 2d 729, 786 N.W.2d 78. Second, Frey's claim for lost profits in its complaint included those during the entire period of the noncompete agreement, which included the period from August 21, 2018, to November 2018. The noncompete agreement was attached to the complaint. Therefore, Hasheider had notice that Frey was seeking damages for the entire noncompete period, including the damages incurred after August 2018.

## II. Attorney fees

¶56      Finally, Hasheider argues that the circuit court erred by granting summary judgment to Frey for the $8,677.64 in attorney fees that it incurred in the 2017 lawsuit. Citing the third-party litigation exception to the American Rule, the court stated that Hasheider's wrongdoing "forced [Frey] to sue [Bauernhuber] for breach of contract." Hasheider contends that the third-party litigation exception to the American Rule does not apply to the facts of this case.

¶57      Under the American Rule, which Wisconsin has adopted, "parties to litigation are generally responsible for their own attorney[] fees." *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571, 547 N.W.2d 592 (1996). One

"narrow exception" to the American Rule is the third-party litigation exception, which applies "when a party is 'wrongfully drawn into litigation with a third party.'" *Talmer Bank & Tr. v. Jacobsen*, 2018 WI App 15, ¶8, 380 Wis. 2d 171, 908 N.W.2d 495 (citation omitted). "In such cases, the attorney fees are rightly regarded as 'an item of damage flowing from the present defendant's wrongful act.'" *Id.* (citation omitted).

¶58    Two elements make up the exception. First, "the party from whom fees are sought must have committed a wrongful act against the party seeking attorney fees." *Id.*, ¶9 (citation omitted). "[A] breach of contract as well as tort may be a basis for allowing [a] plaintiff to recover reasonable third-party litigation expenses." *City of Cedarburg Light & Water Comm'n v. Glens Falls Ins. Co.*, 42 Wis. 2d 120, 126, 166 N.W.2d 165 (1969). If Hasheider is ultimately found liable for tortious interference with the noncompete agreement, then the first element will have been met. Hasheider does not contest this proposition.

¶59    Second, the defendant's wrongful act must have "forced the party seeking fees into litigation with a third party, or required the party seeking attorney fees to incur expenses protecting that party's interests against claims arising from the wrongful act." *Talmer Bank & Tr.*, 380 Wis. 2d 171, ¶9. The parties dispute whether Frey was forced into litigation with Hasheider as a result of Hasheider's alleged tortious interference with the noncompete agreement.

¶60    Hasheider argues that Frey cannot collect attorney fees from the 2017 lawsuit as that litigation was not related to Hasheider's alleged wrongful conduct. According to Hasheider, that lawsuit concerned Bauernhuber's breach of the noncompete agreement, not Hasheider's alleged tortious conduct.

¶61     However, Hasheider's wrongful act of hiring and employing Bauernhuber in a manner that allowed him to violate the noncompete agreement forced Frey to sue both Bauernhuber and Hasheider in order to protect its interests provided in the noncompete agreement. Stated differently, Frey's attorney fees incurred in the 2017 lawsuit were indeed a result of Hasheider's wrongful act. The fact that Frey sued both parties separately does not mean that Frey cannot recover from Hasheider for its attorney fees from the 2017 lawsuit. Frey had to sue both parties to fully protect its interests. The 2017 lawsuit concerned a breach of contract claim against Bauernhuber, while the present lawsuit concerns a claim against Hasheider for tortious interference with Bauernhuber's contract. The latter does not seek to remedy Bauernhuber's breach of contract, but instead to compensate Frey for Hasheider's tortious actions.

¶62     Hasheider does not dispute that Frey did not recover from Bauernhuber $8,677.64 in attorney fees incurred in the 2017 lawsuit.[12] Given the foregoing, there are no genuine issues of material fact, and the circuit court properly granted Frey summary judgment on the attorney fees issue if Frey is ultimately successful on its tortious interference with contract claim.

## CONCLUSION

¶63     Genuine issues of material fact regarding whether Hasheider intentionally interfered with the noncompete agreement preclude the grant of summary judgment to Frey on its tortious interference with contract claim. We

---

[12] Hasheider contends that Frey "waiv[ed]" its claim for attorney fees from the 2017 lawsuit because the noncompete agreement "permitted" it to collect "attorney[] fees," yet Frey did not seek them in that lawsuit. Hasheider does not support its argument with reference to legal authority. Instead, the argument is supported by only general statements. Therefore, we deem the issue undeveloped and will not consider it further. *See Pettit*, 171 Wis. 2d at 646.

28

therefore reverse the circuit court's summary judgment order and remand for further proceedings consistent with this decision. If a trier of fact determines that Hasheider acted with the requisite intent to tortiously interfere with the noncompete agreement, we conclude that disgorgement is a proper remedy, the court did not erroneously exercise its discretion by applying disgorgement to the facts of this case, and the court properly determined that Hasheider caused damages to Frey in the amount of $77,754.51. In addition, if Frey is successful on its tortious interference claim, it is entitled to recover from Hasheider attorney fees, in the amount of $8,677.64, which it incurred in the 2017 lawsuit.

*By the Court.*—Order reversed and cause remanded with directions.

Recommended for publication in the official reports.